The State ex rel. Thomas v. Williams.

THE STATE *ex rel.* THOMAS v. WILLIAMS, *Recorder of Voters.*

99   291
123   540

99   291
133   167

99   291
140   502
72a   631

99   291
78a   543

1. **Mandamus:** CERTIFICATE OF ELECTION TO OFFICE: RETURN. Where, in a *mandamus* proceeding against the recorder of voters of the city of St. Louis, to compel the recorder to issue relator a certificate of election as marshal of said city, the return denies that the relator possessed the necessary qualifications for the office in several particulars, and, upon the issue thus joined, the evidence supports the return, a peremptory writ will be denied.

2. ——: ——. It is incumbent on the relator, in such case, to show himself the possessor of a clear legal right to the remedy he seeks. If the evidence renders it doubtful as to his qualifications for the office, the writ will be denied.

3. ——: ——. Where, in such proceeding, the return of the recorder fails to put in issue relator's qualifications for the office, the court, upon proper suggestion by the actual occupant of the office that he is entitled thereto, and that the relator has not the necessary qualifications, will require the recorder to definitely raise such issues in his return, under the penalty, if he fails to do so, of permitting said incumbent to be made a party to the proceeding, with the right to be heard in the cause.

4. **Offices and Officers:** QUALIFICATIONS: ESTOPPEL. One who applies for a saloon license, obtains permission to sell liquors, but never actually takes out the license, though he conducts the saloon under repeated promises to pay for the license, cannot, when sued years thereafter for the amount of the license, resist payment on the ground that he really never obtained the license; he is plainly estopped from so doing, and the principle of estoppel applies in like circumstances to a case where one is a candidate for office, and it is necessary to his eligibility that he prove he is not indebted to the city for a saloon license.

5. ——: ——: EVIDENCE. A receipt for taxes, gotten up in general form after the day of election, no sum being stated, or property mentioned, is worthless as evidence to show that the candidate has paid his taxes.

**6.  Office, Qualifications for.**   Where the legislature has the power to prescribe qualifications as to the eligibility of a candidate for office, it can prescribe that such qualifications shall exist at the date of the election.

**7.  Presumption:** OFFICIAL DUTY.   Presumptions are indulged in favor of the performance by public officers of their official duties.

### Mandamus.

PEREMPTORY WRIT DENIED.

*Rassieur & Schnurmacher,* with *Thos. C. Fletcher,* for relator.

(1)  Relator was duly elected marshal, and it is the mere ministerial duty of the recorder of voters to issue to him a certificate of election; failing to perform such duty, as an officer, *mandamus* is the only remedy of relator.  *State ex rel. v. Steers,* 44 Mo. 224; *State ex rel. v. Berg,* 76 Mo. 147; *State ex rel. v. Harrison,* 38 Mo. 544; *State ex rel. v. Albin,* 44 Mo. 346.   (2)  The qualifications of relator to take and hold the office cannot be inquired into in this proceeding.   Authorities, *supra.* (3)  Relator possesses all the qualifications required by the provisions of section 10, article 4 of the charter of the city of St. Louis.

*Jos. S. Laurie* for respondent, Williams.

Respondent Williams does not feel called upon in this proceeding to defend the jurisdiction of the circuit court, nor does he confess the demurrer, but submits the questions therein involved to the determination of this court.

*W. C. Marshall* for respondent, Neiser.

(1)  The relator is not entitled to a peremptory writ of *mandamus.*   *State ex rel. v. Newman,* 91 Mo. 445.   (2)  Relator was in arrears of taxes.   (3)  Relator was indebted to the city of St. Louis.   (4)  Relator had not been a resident of the city of St. Louis for two years next preceding the election on the second of April, 1889.

SHERWOOD, J.—This is an original proceeding by *mandamus* to compel the recorder of voters to issue a certificate of election to Emil Thomas, the relator, who claims to have been elected marshal of the city of St. Louis, by reason of being qualified for that office, and by reason of having received the highest number of votes therefor, at an election held on the second day of April, 1889.

The first return of the respondent, while it "admits that said relator, at such election, received a majority of the votes cast at said election for said office," yet further states that "whether relator possessed the qualifications for said office prescribed by the charter as alleged, respondent can only say that he knows nothing to the contrary, and did not consider that the duties of his office, as recorder of voters, required, or authorized, him to pass upon or determine the eligibility of candidates." It was further alleged in the return that, at the close of the election, respondent cast up the votes cast, ascertained that relator received the highest number of votes, etc., and was about to give him a certificate of election, when he was restrained from so doing, by an injunction issued out of the circuit court on the sixth day of April, 1889, directed against him and relator, and based upon the petition of Martin Neiser, the present incumbent, which alleged that the relator did not possess the qualifications for said office required by the charter; that, upon demurrers filed questioning the jurisdiction of the circuit court to entertain the petition, the injunction was dissolved, the petition dismissed, and on the same day, April 29, 1889, Neiser was granted an appeal to this court, giving *supersedeas* bond, etc.

Upon this return being made, Martin Neiser filed a motion asking to be made a party, alleging that he, himself, had been elected marshal at the election aforesaid, and that, if granted time so to do, he could establish the fact of his election and relator's ineligibility;

and, further, Neiser suggested in effect that the return of respondent was evasive or collusive, and did not put the relator upon the proof of his averment that he possessed the necessary qualifications. This motion being passed upon, resulted in an order being made by a majority of this court, granting the motion of Martin Neiser " to be made party defendant, and for leave to be heard in the cause   *   *   *   unless the respondent, within five days from this date, make that portion of his return, touching the qualifications of relator for the office in question, definite, positive, direct and certain."

Thereupon, the respondent filed an amended return, in substance like the first, with the exception that it distinctly puts in issue the qualifications of relator for the office of marshal, by setting forth qualifications required by the city charter, and giving in detail reasons why relator did not possess such qualifications.

Neiser also filed an answer on the same day, June 24, 1889, as party defendant, claiming that he was elected to the position of marshal in 1885, for four years, and that, under the city charter, he was entitled to hold his office until his successor was elected and qualified, and further alleged that relator did not possess the qualifications of the office required by the city charter, giving details similar to those given in the return of the respondent.

To this amended return, and this answer on the day of their filing, replications in denial of their chief averments were filed.

On the twenty-eighth of June, 1889, an order was entered by this court authorizing the taking of depositions in support of the issues joined, and granting leave to Neiser to appear and cross-examine relator's witnesses, as well as to produce and examine witnesses on behalf of respondent. In response to this order, depositions have been taken by relator and by Neiser, and are now before us.

This is the shape this cause is now in, and we shall proceed to discuss it in the shape we find it; and, inasmuch as the amended return of respondent controverts the qualifications of the relator, it becomes unnecessary to comment on the propriety of making Neiser a party to this proceeding. It is not impertinent, however, to state that in the case of *Strong, Petitioner*, 20 Pick. 484, relied on by relator, where Strong applied for a *mandamus* to compel the issuance to him of a certificate of election, notice was ordered to be served on the *incumbent*, whose rights, Chief Justice SHAW suggested, might be affected in case the writ went, and notice was given accordingly. If the original return of respondent had put in issue the qualifications of relator for the office of marshal, by direct denial or by "something equally as good," *i. e.*, that which would be the legal equivalent of such denial, this would have sufficed. High's Ex. Leg. Rem., sec. 460. And nothing short of this would suffice. *State ex rel. v. Williams*, 96 Mo. 13.

As the return admitted that relator had received a majority of the votes cast, and as the residue of that return was a virtual admission of the qualifications of relator for the office, there was nothing left remaining for the relator to do, but to move for a peremptory writ on the pleadings. This course we could not allow to be pursued, especially in view of the suggestions made under oath by Neiser, the incumbent, that relator was ineligible to the office in question. Had we done so, it would have been to permit an abuse of the process of this court. These considerations induced a majority of this court to make the order it did in relation to the return of the respondent.

Having thus shown how this case stands, and the issues raised by the pleadings, to-wit, the petition which is treated as the alternative writ, and the return of respondent and the reply to same, we shall address ourselves to the questions presented by the testimony as applied to the issues made on the pleadings. As the

reporter will accompany this opinion by a statement of the substance of the testimony adduced, it is deemed unnecessary to do but little more than to give an outline, or brief statement, of the salient facts in evidence, our conclusions of fact thereon, with brief reasons therefor, and then, upon this fact basis, present our reasons for the conclusions which we think the law draws from those premises of fact.

Section 10, article 4, of the charter of the city of St. Louis, provides that: " All elected and appointed officers shall possess the following qualifications: They shall have been citizens of the United States and of the city of St. Louis for at least two years previous to their election or appointment, and shall be able to read and write the English language. They shall not, at the time of their election, be in arrear to the city for taxes, or indebted to the city in any way," etc.

With these charter provisions before us, our conclusions from the testimony are these:

I. That the relator was not, on the second day of April, 1889, the day on which the election occurred, eligible to the office of marshal, not having been a citizen of St. Louis for at least two years previous to such election. His hurried departure from St. Louis to Salt Lake in October, 1885, overwhelmed with debt, to be gone, as he says, but twenty days; his practical abandonment of his family to care for themselves and to beg assistance from others; his entire abandonment of his saloon business, without making any provisions for its continuance or even so much as making inquiry about it, or asking or receiving any report from his supposed barkeeper, Rumsey, as to what had become of that business; his ability to return to St. Louis at any time, as he says; his prolonged and seemingly aimless absence for twenty-three months ending in September, 1887, having no business there except an attachment suit still pending against " Enterprise mine, for money owed to him years and years ago," all stamp relator's story as one scarcely

consistent with continuous citizenship in the city of St. Louis; and this effect is by no means lessened, when, in connection with his own statements as a witness, we place those he made to another witness, his intimate friend Peterson, to the effect that, while he was marshal, he loaned Capt. Donaldson some money which went into the purchase of Enterprise mine, and, relator having no papers to show for his interest, Capt. Donaldson said he should not be forgotten, and that, after Capt. Donaldson's death, his widow, Mrs. Donaldson, wrote to him, requesting him to go out with her to Salt Lake, and that he should have an interest in the mine; that moved by this request he went out there with Mrs. Donaldson, and straightway brought an *attachment* suit against the property of a *dead* man, and the very same property he went out for the express purpose of obtaining the promised interest in.

II.    That relator was ineligible to the office of marshal on the second day of April, 1889, by reason of the fact that he was indebted to the city of St. Louis for a saloon license to the extent of $138.50.    This saloon he opened, as he admits, and started the business, but he denies ever having made application for a license; still he admits that, when called upon by the collector for the amount of his license, just before his sudden departure for Salt Lake, he referred him to his friend Krauss, for the money, not that Krauss had agreed to pay it for him, but because he thought he would do so as an old friend. The testimony of Sexton, the collector, a disinterested witness, is, however, to the effect that Thomas started the saloon, didn't pay the license, kept promising to pay it; that he saw Thomas about it; that he thought Thomas was a good fellow, a little hard up, so he waited on him awhile, but Thomas "skipped out" and never did pay it.

Daily, a former deputy collector, also testified that he saw Thomas about paying for the saloon license, perhaps half a dozen times while he was running the

saloon; that Thomas came to the office and begged for time in which to pay, but up to the time of Daily's leaving the collector's office in April, 1889, the license had not been paid.

It is now gravely urged by relator's counsel, that, relator *never having received a saloon license from the city, he does not owe the city for it,* and we are referred to the provisions of the revised ordinances of the city, chapter 37, article 2, sections 1 to 7.  Looking at those sections, we find various provisions as to the amounts to be paid for differently graded licenses, and section three requires applications for licenses to be made *in writing* to the collector.  As to this point, there is no force or merit in it, for the reason that Thomas, having enjoyed the benefits of a saloon license, on the promise to pay for it, it does not lie in his mouth, and *he is estopped,* to say that, after having all the privileges conferred by a saloon license, he did not get the *mere paper,* which was but the evidence of previously granted authority.  If, after conducting a saloon, and after making repeated promises to pay for the license, he had been sued by the city for the amount due for that license, it is clear he could not interpose such a defense to the action of the city, and, for the same reason, such an objection must be equally unavailing here.

III.  That relator was ineligible to the office of marshal, on the second day of April, 1889, in consequence of his being in arrears to the city for taxes.  He admits, himself, that the last time he had paid any taxes was five years ago, "somewhere around that neighborhood;" that the taxes, that is personal taxes, for 1885, 1886, 1887 and 1888, were due and unpaid on the second day of April, 1889, and that he was unaware that taxes for those years had been assessed against him, until the injunction suit of Neiser was brought, when such taxes were at once paid.  The injunction in behalf of Neiser was not issued till the fourth of

April, 1889. And the testimony of Sexton, the col- lector, does but confirm these admissions of relator. He distinctly states that, at the time of the election, the taxes of relator were not paid ; that Travis did not, prior to the election, call to see about relator's taxes; that *after* the election, in April, Gerber, his deputy, called him into the real-estate department to see somebody about Thomas' taxes. Going in there, he saw "Travis, Filley's brother-in-law," who wanted to see the bills for Thomas' taxes; that, being shown the bills, Travis put down the amount, but didn't pay anything at the time; and that Travis did not, prior to the election, come to his office and offer to pay the back taxes of Thomas. Sexton also testifies that there was always kept, in the office of the collector, a book of delinquent personal taxes, showing the amounts and years; that said book was in the office at the time, and was never allowed to go out of it.

This statement of Sexton is supported by that of Knapp, the cashier, in the collector's office, as to such a book being kept in the office, and that it was there in March and April, 1889, and was not turned over to the comptroller when tax bills were given out to that official for collection. This testimony, as to the delinquent tax book always being in the office, is uncontradicted. This uncontradicted testimony about this book goes very far towards showing that the excuse of the tax bills being out in the comptroller's hands, and, therefore, relator's taxes could not be paid, is a very lame one. And Travis, though a former deputy collector himself, and, for this reason, presumably well acquainted with persons in the city, does not pretend to give the name of the deputy collector to whom, he says, he offered to pay Thomas' tax bills; says he does not know the *name* of the deputy to whom he made the offer. He says that this unknown deputy told him there were no bills against Thomas; that he himself

tried to find the delinquent tax books, but could not; took Berger, deputy collector, and entry clerk to assist in looking for the books, "*but did not tell Berger what he was looking for.*" He says, further, that, a day or two *after* the election, he saw Sexton, the collector, and the latter said the Thomas bill amounted to something like a *thousand dollars.* But Schoonheven, who attempts to support Travis, does so by testifying that the last Saturday or Monday in March, 1889, at Travis' request, he went with him to the collector's office; that "Travis told him he wanted him to go and pay attention to what was said," and they called on one of the clerks for Thomas' bills, all·he owed for taxes; that, while the clerk was looking, Sexton came forward, and, when Travis repeated to him what he had said to the clerk, Sexton said that the bills were more than Travis could pay, *a couple of thousand dollars;* that Sexton thereupon went back among the books, and came back and said that the *books* had gone to the comptroller's office; had not been returned, and that Travis asked one of the clerks to look over the books and give him a memorandum of the taxes, and he saw the clerk looking among the books, but did not see Travis looking for any book.

It will be readily seen from what has been said that Travis is unsupported by Schoonheven in material parts of his testimony, and contradicted in others. These are the only witnesses who testify that any offer to pay Thomas' taxes was made prior to the election, though, if this were true, it would seem easy to have shown the deputy to whom Travis made the offer he says he did.

Gerber, deputy collector, testifies that Schweickhardt paid relator's taxes *between fourth and sixth* of April, 1889, between twelve and two o'clock, the amount being over one hundred dollars; that the delinquent tax bills were not in his hands, and so he simply gave a certificate at the time, by recording them, showing all taxes had been paid, and, afterwards, Schweickhardt paid a bill which had not been paid at the time

the others had been, and that it was not until after April 22, 1889, the date Zeigenhein qualified, that Thomas' taxes were entered paid *on the cash book*.

The receipt of Gerber, as deputy collector, is dated April 4, 1889, and states: "This is to certify that all taxes for state, school and city assessed against Emil Thomas have been paid to date." It is unnecessary to say that this so-called tax receipt is not in usual form, does not pretend to acknowledge the payment of any particular sum of money, *and seems to have been gotten up for the occasion*. But, in any event, it is valueless as evidence.

The remarks already made, as to the presence of the delinquent tax books in the collector's office, show there was no necessity for the presence of the bills in order to know the amount of relator's taxes; and it is worthy of note that the sum thus paid in bulk was never entered even on the cash book, until after Zeigenhein qualified, but how long after is not stated.

The testimony of Casey, the janitor in the tax department and collector's office, and Wolff, deputy collector, show that shortly *after* the election was over *great interest became suddenly manifest in the fact whether Emil Thomas' back taxes were paid;* that two unknown gentlemen called on Gerber on the fourth or fifth of April, *after office hours*, who seemed anxious to see him; that they talked with Gerber about Thomas' taxes, but paid him no money; and on the *fifth or sixth of April*, also, *after office hours*, one Carr, a saloon keeper, came to see Gerber also about Thomas' taxes, and, in response to what Carr said, Gerber replied as they both left the office: "*If Mr. Schweickhardt is so much interested in this case, why didn't he come over and see about it himself?*"

Taking all these circumstances into consideration and others of similar drift and nature, we can but con- clude that there was no genuine and honest effort ever

made to pay relator's taxes prior to the day of election; and, perhaps, we would not be going too far to say that no honest or genuine endeavor has been made to pay them *since* the election; there not being a particle of testimony that any book save the cash book shows that any payment of relator's taxes has been made. But it is urged that it nowhere appears from the testimony *what* taxes were arrears; that it is not shown that there were any arrears of taxes *due the city.* This is true, but the blank certificate given by deputy Gerber, introduced in evidence by relator, is, to say the least of it, a tacit admission that taxes were due the city, else why recite *they were paid;* and, besides, the tax assessor is presumed to do his duty, and as it was shown that Thomas had personal property, and that there were taxes due on it, it will be presumed that city taxes were also included in the list. To presume otherwise, would be to presume contrary to the faithful discharge of official duty, a presumption never indulged. *Long v. Joplin, M. & S. Co.*, 68 Mo. 422; *Henry v. Dulle*, 74 Mo. 443; *Bush v. White*, 85 Mo. 339; *Breckenridge v. Insurance Co.*, 87 Mo. 62; *Addis v. Graham*, 88 Mo. 197; *Lenox v. Harrison*, 88 Mo. 491; *Hammond v. Gordon*, 93 Mo. 223.

But we are not to be understood as saying that anything short of a payment, *prior to the day of election*, would satisfy the demands of the charter. If the legislative function may be exercised at all as to the eligibility of candidates, if it may prescribe conditions, reasonable of course, and capable of being performed, it is difficult to see why it may not be prescribed that such conditions *shall be performed or exist, by a time certain*, and, without this, that the candidate shall not possess the attributes of eligibility on the day of election.

In a number of instances, it has been ruled that such an exercise of legislative power is valid as to *voters*, and that unless qualified at such a time by reason of residence, registration or the payment of a tax, they shall

not be deemed qualified at all. McCrary on Elections [3 Ed.] secs. 52, 78; *Myers v. Moffet*, 2 Bart. El. Cas. 564. And, in quite a recent case in Illinois, it has been held that an act was valid which denied the right to vote to all persons not registered on or before a fixed day prior to the election. *People ex rel. v. Hoffman*, 116 Ill. 587. To the same effect are *Capen v. Foster*, 12 Pick. 485; *In re Polling Lists*, 13 R. I. 729; *State v. Butts*, 31 Kan. 537; *Patterson v. Barlow*, 60 Pa. St. 54; McCrary on Elec., secs. 95, 96. And, certainly, no just distinction can be taken between the power of a legislative body, when exercised in regard to the qualifications of a voter, and the performance of conditions precedent to the enjoyment of the elective franchise, and the performance of similar conditions on the part of those who offer themselves as candidates at the polls.

We have been cited to the case of *State ex rel. v. Murray*, 28 Wis. 96, as showing that such conditions precedent are of no avail, provided they be complied with anterior to *taking office.* But that case *did not present any such feature;* there were *no restrictions or conditions*, either constitutional or statutory, in that case; and the supreme court there very properly held that an alien might be elected to an office to commence in the future, and he become eligible, thereafter, by naturalization. See also McCrary Elec., sec. 311.

In the remarks heretofore made touching the qualifications of the relator, it is to be borne in mind, not only that he is the party holding the *affirmative,* and therefore having the burden of proof, but that, in calling upon this court to issue its writ of *mandamus,* he must show himself the possessor of a clear legal right to the remedy he seeks; and that consequently, if his evidence or his pleadings leave any essential point in doubt, such doubt will be resolved against him, and such remedy denied him. Where the right is doubtful, the mandatory authority of this court cannot be successfully invoked. *State ex rel. v. Albin*, 44 Mo. 346.

An attempt has been made to distinguish the case at bar from that of *State ex rel. v. Newman*, 91 Mo. 445. It may be distinguished *in fact*, but certainly not *in principle*. There the return showed that relator did not possess the requisite qualifications, but the writ was so evasive in its character as to be regarded by us as tantamount to an admission that the requisite qualifications were not possessed.

Here the return denies that relator possesses the necessary qualifications in several particulars, and upon the issues thus joined the evidence adduced supports that return ; but if that evidence fell short of this, if it rendered it even doubtful whether the relator was entitled to the remedy he seeks, the result must be the same. And for reasons already given, and rulings made in another case, the injunction proceeding of Neiser forms no obstacle to our action in this one.

Controlled by these reasons, we shall deny the peremptory writ. All concur ; RAY, C. J., and BLACK, J., in the result ; BARCLAY, J., in a separate opinion.

### SEPARATE OPINION.

BARCLAY, J.—In his return to the alternative writ the respondent asserted, and all parties admit, that the circuit court, by a restraining order in the case of *Neiser v. Thomas and Williams*, enjoined the respondent, Williams, from issuing the certificate which this court is asked to compel him, by this proceeding, to issue.

It is admitted that, after making the restraining order, the circuit court, upon issue joined, entered a decree vacating it and dismissing the petition in that cause. But an appeal was at once taken by Neiser, the plaintiff, the effect of which was to continue the original injunction in force during the appeal.

The circuit court had undoubted jurisdiction to enter and enforce the restraining order as part of its

general equity powers. Whether the case made by the petition was sufficient to obtain the remedy asked was a question of law, the decision of which would not affect the validity of the preliminary injunction until the decree became final. It is far from accurate to say that, because the facts stated by plaintiff did not warrant the equitable relief prayed, the court had no jurisdiction to make the original restraining order in the cause. It had such power. It exercised it. The injunction was in force pending the review of the cause upon plaintiff's appeal. During its pendency Williams, one of the parties enjoined, could not properly be compelled by *mandamus* to do the act forbidden by the restraining order.

For this reason the peremptory writ of *mandamus* should be denied.

My concurrence is not given to any ruling in this case which may imply that it is within the power of the recorder of voters of St. Louis to pass upon the qualifications of a person to hold a public office, who has received the highest number of votes cast therefor at a regular election. Nor does it seem to me that any issue concerning such qualifications has a proper place in the present proceeding.