THE STATE ex rel. J. L. PORTER et al. v.
FRANKLIN HUDSON et al., Composing Board
of Park Commissioners of Kansas City, Appel-
lants.

**In Banc, March 7, 1910.**

1. **JUDGMENT: Mandamus: Broader Than Contract.** A judg-
ment in mandamus directing the board of park commissioners
of a city to open up a roadway, in pursuance to a contract with
the abutting property-owners, which is broader than the con-
tract and proofs, cannot stand. But if there is nothing else
in the case to preclude relators, they may be permitted to
amend the petition and writ to conform to their proofs and
contract, if they so elect, and to take a judgment in accordance
therewith. Otherwise, they can have nothing.

2. ————: **Right: Ministerial Duty.** A ministerial duty enforce-
able by mandamus is one in which nothing is left to discretion.
It is a simple, definite duty, arising under conditions admitted
or proved to exist, and imposed by law. The writ will not issue
in cases of doubtful right. The relator must allege and prove he
has a clear, unequivocal, specific right to the thing claimed.

3. ————: ————: **Executory Contract.** Mandamus will not lie
to compel the board of park commissioners to open up a roadway
in front of relators' property, in obedience to a contract, if
either the contract is uncertain and equivocal, or if it is en-
tirely executory on the board's side and executory in vital fea-
tures on relators' side.
   *Held*, by VALLIANT, J., dissenting, that the contract made be-
   tween the park commissioners and the property-owners for
   a change of the roadway through the park to a line along
   the abutting property, was not executory, since the board
   did locate it according to the contract, and had authority
   to locate it there, and accepted the consideration relators
   agreed to pay, and with that the board's discretion ended,
   and hence it had no discretion to violate the contract.

4. ————: **Park Board: Proceeding Without Ordinance.** The
board of park commissioners of Kansas City has no power, un-
der the charter, to accept grants of land coupled with condi-
tions, without an ordinance or consent of the council. Nor can
it accept money or other personal property, upon condition,

without such consent. And though it has contracted to do so, the court cannot by mandamus compel it to comply with the contract.

5. ————: ————: ————: **Constructing Roadway.** Nor can the court compel said board to improve or change the location of a roadway or parkway, in accordance with a contract with owners of private property, unless such board is supported by an ordinance, prescribing the manner of paving, guttering or otherwise improving the way. Such a contract is incomplete unless vitalized by the city council.

   *Held,* by VALLIANT, J., dissenting, that the park commissioners, unless compelled to construct the roadway according to their contract, can construct it along any other line, and shut out the property of relators, and leave that property without any roadway at all, and leave relators without remedy; and therefore mandamus will lie, since the board had authority to construct the roadway where they had agreed to construct it.

6. ————: ————: **Duty to Construct Roadway.** A suit to compel the park board to construct a specific roadway, along certain agreed lines, at an agreed cost, will not authorize a mandamus writ to construct any needed roadway. The fact that a roadway is needed will not authorize the court to compel the construction of the specific way.

Appeal from Jackson Circuit Court.—*Hon. Thos. J. Seehorn,* Judge.

REVERSED AND REMANDED (*with directions*).

*Jno. T. Harding, W. L. Lampkin* and *C. O. Tichenor* for appellants.

(1) This is an action, not in equity, but by mandamus, for the specific performance of an agreement. The board has simply agreed to locate and construct a boulevard. "It is equally elementary that mandamus will not lie for the enforcement of mere contractual obligations." U. S. v. Railroad, 138 Fed. 852; State ex rel. v. Howard County, 39 Mo. 375; Mansfield v. Fuller, 50 Mo. 338. "Nor has a court any authority to compel the performance of executory contracts" by mandamus. State ex rel. v. Associated Press, 159

Mo. 442. (2) Plaintiffs claim that for this small sum of money so received, defendant's charter powers have been bartered away; that the mere acceptance of this offer—an offer never presented to the council—one which is unfair to the city and unjust to the rest of the owners in the park district, who must pay that which plaintiffs fail to pay for the improvement of their ground—caused their grounds to differ from all other grounds in the park district, without a shadow of reason therefor, depriving the board of its power to do its duty, to correct mistakes, to alter the route of the boulevard, to repent of wrongs done, compelling it to violate the rights of those it represents as trustees. All this, too, in face of section 19, article 10, and section 15, article 8, of the charter. Simpson v. Kansas City, 111 Mo. 242. (3) "Where a party has a clear, legal right to demand the performance of a specific duty and there is no other adequate remedy, mandamus will generally lie to compel performance. But it is essential that the relator have a clear legal right to the thing demanded, and it must be the imperative duty of the respondents to perform the act required." 19 Am. and Eng. Ency. Law (2 Ed.), pp. 725 and 730; State ex rel. v. Cottengin, 172 Mo. 134. The judgment in this case compels a breach of trust. "In effect it would be transferring the property of one individual to another." McCormack v. Patchin, 53 Mo. 36; State ex rel. v. Bridge Co., 206 Mo. 147. (4) If the offer of February 15, 1905, and the acceptance of it by a divided board were valid, even then, if the members believed that they had made a mistake or that they had done violence to their duty, they had the power, and it was their duty, to annul it, tendering back the money and deeds—placing the parties in *statu quo*. If the acceptance had any vitality, it was because the board was acting in its governmental capacity, and the rescind-

26 Sup—16

ing was done in like capacity. Ely v. St. Louis, 181 Mo. 729. It was a matter of ''governmental discretion.'' Ruppenthal v. St. Louis, 190 Mo. 224. The court will not interfere with such discretion by mandamus. Barber Asphalt Co. v. French, 158 Mo. 547; State ex rel. v. Brown, 172 Mo. 382; Simpson v. Kansas City, 111 Mo. 242; Moore v. Cape Girardeau, 103 Mo. 475; State ex rel. v. Schweickardt, 109 Mo. 511. (5) Even though this deal was valid, was a matter for the public and one as to which it was the clear duty of the board to act, then the court would go no further than to compel the board to act. But it had acted before this proceeding was brought, by reconsidering the whole transaction and tendering back money and deeds. Clay City v. Roberts, 124 Ky. 601; Frank v. St. Louis, 145 Mo. 600. (6) The commissioners did not have the power to purchase lands, receive deeds and to establish and construct the boulevard in question without an ordinance of the council. The board is not a corporation like, e. g., that of Chicago, which is in terms incorporated and which in terms as to streets has all ''the power and authority now conferred upon or possessed by the common council.'' McCormick v. Park Comrs., 150 Ill. 522; Kansas City v. Ward, 134 Mo. 186; Kansas City v. Smart, 128 Mo. 286; Kansas City v. Bacon, 147 Mo. 259. (7) The powers of the board are closely guarded by the charter. It has no power to establish a street or boulevard. Charter, art. 3, p. 24; Art. 10, secs. 1, 5, 6, 7, 8, 9, 19, 24 and 34. (8) Sections 31, 34 and 37 of article 10, of the charter, nowhere invest the board with authority to establish boulevards—they do not even attempt to rob the council of ''its exclusive control and power over streets . . . to establish,'' etc., given by section 1, of article 3.

*Cowherd & Ingraham, Ball & Ryland* and *Bowersock & Hall* for respondents.

(1) There was complete compliance on the part of the property-owners with what the board required of them. The location of the roadway was determined and fixed by the board, as by the charter it was fully authorized to do. Charter and Rev. Ord. (1898), art. 10, secs. 4, 5, 6, 31, 34, 36 and 38. (2) The roadway being thus located, it was and is the public duty of the board to proceed with its construction, and the action lies to compel it to perform that duty and is in no sense "for the enforcement of a mere contractual obligation." (a) Because they are merely administrative and ministerial officers. Kansas City v. Ward, 134 Mo. 186; State ex rel. v. Berg, 76 Mo. 136; State ex rel. v. White, 34 Mo. App. 325; State ex rel. v. Olner, 116 Mo. 188; State ex rel. v. Chase, 42 Mo. App. 343; State ex rel. v. Meier, 72 Mo. App. 618, 143 Mo. 439; Dreyfus v. Longergan, 73 Mo. App. 336; State ex rel. v. Cook, 174 Mo. 100; State ex rel. v. Stokes, 99 Mo. App. 236; State ex rel. v. Smith, 104 Mo. 661. (b) Because the mere fact that the law vests them with certain discretion, does not alter the application of the rule. Kalbfell v. Wood, 193 Mo. 675; State ex rel. v. Adcock, 206 Mo. 550; State ex rel. v. Swanger, 212 Mo. 472; Klein v. People, 31 Ill. App. 302. (c) Because the building of the roadway is merely a ministerial act and the duty to build is imposed by law. Ruppenthal v. St. Louis, 190 Mo. 213; State ex rel. v. Railroad, 86 Mo. 13; Sheridan v. Fleming, 93 Mo. 321; State ex rel. v. St. Louis, 145 Mo. 551; State ex rel. v. Railroad, 206 Mo. 251; Printing Co. v. St. Louis, 213 Mo. 22; Charter and Rev. Ord., art. 10, as above; Sheaff v. People, 87 Ill. 189; People v. Commissioners, 158 Ill. 197; Drainage Dist. v. Adams, 61 Ill. App. 435; McCarty v. Boston, 74 N. E. (Mass.) 659; Ingerman v. State, 128 Ind. 225; State v. Road Co., 37 La. Ann. 589; State v. Bell, 49 La. Ann. 676; Richmond Co. v.

Brown, 97 Va. 26; Brazoria Co. v. Bridge Co., 80 Fed. 10. (d) Because, the board having exercised its discretion in locating the roadway within the parkway, and having also exercised its discretion given by section 31, supra, as to the manner of payment for the construction, the contract with the property-owners was valid, and it was not competent for appellants to annul the prior action of the board and refuse to construct the road. Dausch v. Crane, 109 Mo. 323; State ex rel. v. Bell, 49 La. Ann. 676; Western v. Newberg, 67 Hun (N. Y.) 127; Borough of Rutherford v. Traction Co., 63 Atl. (N. J. L.) 84; State ex rel. v. Gates, 190 Mo. 558. (3) There was nothing in the contract of the property-owners (with which they fully complied) to taint or vitiate the action of the board. Borough of Rutherford v. Traction Co., supra. (4) No ordinance or action of the council was necessary, either for the location of this roadway within the parkway, or for its improvement when so located. Ample power and the plain duty to do both was the board's. Charter, as above. (5) Contentions made by appellants respecting the deeds are not only de minimis, but wholly immaterial. The dedications were not to be made until the roadway was "constructed and paid for."

LAMM, J.—Mandamus. Relators below will be dubbed "plaintiffs;" respondents, "defendants." The alternative writ was made absolute below, commanding defendants as follows:

"Within a reasonable time and with reasonable expedition, as board, to cause to be graded and constructed the roadway on The Paseo extension in said city between the south line of Twenty-seventh street and the north line of Thirty-first street, so that said roadway between said Twenty-seventh street and Twenty-ninth street shall be located adjacent to the west line of said Paseo extension and located and constructed between said Twenty-seventh and Thirty-first

streets in accordance with the plans and location therefor adopted by the board of park commissioners of said city on February. 15, 1905, as shown by the plan and profile herein filed and referred to as 'Exhibit 2.'

"It is further considered, ordered and adjudged by the court that the cost and charge for the construction of said roadway be paid out of the South Park district funds, and that the relators have and recover of and from the defendants all the costs herein incurred in this cause and have thereof execution."

From that judgment defendants appeal here. Under spur of public welfare the cause was advanced and heard In Banc.

Troost Park at one time was a private park owned and managed by a street railway company, as we make out. Its size is dark, but we infer it is bounded on the north by Twenty-seventh street and lies between that and Twenty-ninth street on the south. The Paseo is a public parkway or park scheme in charge of defendants as a board of park commissioners. It extends a great ways, and at the point in hand runs nearly north and south. We infer that the name "Paseo" covers not only a boulevard proper, but at certain places includes ground on one or the other side devoted to public park purposes, thereby swelling out to the limit of a park, anon dwindling to a boulevard. At a certain time Troost Park was condemned and taken over by the city, under the exercise of its charter right of eminent domain, as part of The Paseo scheme. Plaintiffs owned lots and parcels of land abutting Troost Park on the west for two blocks or more, say from Twenty-seventh street to Twenty-ninth street—said streets not crossing Troost Park. They also owned the land abutting on the west side of The Paseo extension from Twenty-ninth on south to Thirty-first street.

In February and April, 1905 (whether on the initiative of plaintiffs or of the then existing board, we do

not clearly make out), negotiations were on foot between plaintiffs and the then board, looking to the location of a permanent "roadway" along the western line of the Troost Park property, Troost Park having then become part and parcel of The Paseo, as said. There was a lake in Troost Park. It seems that a permanent roadway of some sort was contemplated through this Troost Park at the time the property was condemned—such roadway to become a southern extension of the boulevard, a part of The Paseo scheme. It seems the engineer or landscape architect of the board at the time of the condemnation proceedings made a preliminary study or sketch in the form of a drawing or map showing the contemplated roadway running to the east of plaintiff's property, close to this lake, between Twenty-seventh and Twenty-ninth, so that plaintiffs' property would not touch the roadway as tentatively designed; but the latter, between said points, ran wholly inside the lines of Troost Park, and hence would not be a service street for plaintiffs' property. It seems, moreover, that the same tentative map or sketch showed the proposed roadway as then planned would run along the line of plaintiffs' property from Twenty-ninth street south to Thirty-first street, which latter was the southern terminus of The Paseo, so far as shown by this record. The said negotiations looked towards shoving the roadway farther to the west, between Twenty-seventh and Twenty-ninth streets, so that plaintiffs' property would there abut thereon, and to permanently locate and build it on that line.

The charter of Kansas City provides for a public record to be kept by the board. The engineer's study or sketch aforesaid was preserved by the board, but it made no record locating such roadway by the lake. If, however, the roadway be built by the lake remote from the grounds of private abutting proprietors, the charter scheme did not contemplate that the costs of grading and building it should be assessed against

private property by special taxbills. To the contrary, the costs of grading and building that part of the roadway would come out of the city's common purse, or out of general park funds.

It is contended by plaintiffs that the negotiations aforesaid resulted in a binding contract whereby it became a public duty of the board to locate, grade and build a permanent roadway forty feet wide from gutter to gutter with a sidewalk running along the west side thereof in a twenty-foot strip, part of which was owned by the city and part by said abutting proprietors— the latter at plaintiffs' expense. The facts upon which this contention is based will be presently attended to.

The board conducting and consummating those negotiations presently went out of office and the present defendants were appointed, qualified as a board and assumed the administration of the public trust. At some time in 1905 not disclosed, on demand the law department of the city gave an opinion to the board of park commissioners to the effect that it and the city were not bound by those negotiations nor by the contract resulting therefrom. Thereupon in July, 1905, the board rescinded its action, refused to go on and the present controversy arose, resulting in an absolute mandamus, as said.

The case holds in judgment certain provisions of article 10 of the charter of Kansas City and demands a closer review of the facts; which provisions and facts, briefly outlined, are:

*The Charter*: Article 10 of the charter was adopted at an election held June 6, 1895. Its title is: "Board of Park Commissioners—Establishment and Maintenance of Parks and Boulevards."

Section 1 recites, *inter alia*, that "there is hereby established within the city an executive department to be known as 'Board of Park Commissioners,' " composed of five persons to serve without pay, not subject to confirmation but to be appointed by the mayor.

Sections 2 and 3 require bonds from the commissioners, that a record be kept of its proceedings, etc.

Section 4 provides that the president shall sign all contracts authorized by this article, that three members shall constitute a quorum and that a majority of the members is sufficient to authorize any act of the board.

Section 5 grants power to the board and makes it its duty to devise and adopt a system of public works, parkways and boulevards, to select and designate lands to be used and appropriated therefor, to select routes and streets for boulevards and, *when authorized and approved by ordinance of the common council,* to lease, purchase, condemn or otherwise acquire in the name of the city lands for parks, parkways, boulevards, and similarly, under the approval and authority of such ordinance, to establish, change or re-establish the grade of any boulevard or parkway, etc.

Section 6 ordains that the board shall have power to superintend, control and manage any and all parks, parkways and boulevards belonging to or under the control of the city and such other public grounds and thoroughfares as may, by ordinance of the common council, be placed under the control and management of said board, and to improve, adorn and regulate the same in such manner as it may deem best, and to establish the width of sidewalks and all boulevards and parkways. This section makes it the duty of the common council, upon the recommendation of the board, to pass ordinances for the regulation and orderly government of such parks, parkways and boulevards and to prescribe fines and penalties for violating the same.

Section 7 divided the city into three park districts and provides that hereafter the common council may create new park districts on any change of the city limits or put the added territory into the old district, etc.

Section 8 makes it the duty of the board to provide at least one park in each district and, with the concurrence of the common council, to purchase or "otherwise acquire" real estate therefor. The scheme of this section is that the *common council* has authority by ordinance to purchase, condemn or otherwise obtain land in or out of the city for public parks, parkways and boulevards and to establish the same, on condition that the board first recommend such action. Further, that on such recommendation by the board it is the duty of the common council to proceed by ordinance to carry out such recommendation "as it may deem best." To acquire such lands for such purposes, three alternative powers are given: First, to pay for the same out of the general fund; second, or by the issue and sale of bonds of the city under ordinances of the common council; or third, as "hereinafter provided" (*viz.*: by special assessments of benefits).

Section 9 provides a scheme for assessing benefits and paying for parks, parkways and boulevards thereby.

Sections 10 to 14, inclusive, outline a scheme whereby after due ordinances by the city council, proceedings may be brought in the circuit court to condemn property for parks, for widening boulevards or parkways, etc.

Sections 15 to 27, inclusive, outline a plan for assessing benefits if that theory be adopted in paying for property taken or damaged.

Among other things it is provided that the common council with the concurrence of the board may repeal the ordinance ordering such improvements if a repeal be deemed to the best interests of the city. In such event the judgment for compensation and benefits shall be void.

Section 29 provides that lands acquired under the provision of article 10 shall remain forever for parks, parkways and boulevards for the use of all the inhabi-

tants of said city, subject to rules and regulations prescribed by ordinances of the city council on the recommendation of the board.

Section 31 ordains that the board has power to cause any road, parkway, boulevard or avenue or part thereof, which may be under its control or management, to be graded, regraded, paved, repaved, guttered, reguttered or otherwise improved or repaired, including the construction of sidewalks, in such manner and in such times and with such material as said board may determine, and may pay for such work or improvements or any part thereof out of the funds not otherwise appropriated belonging to the park district or out of the general park fund. This section has a proviso to the effect that when the board recommends to the council that such work be done and the payment of the whole or any portion thereof be made in special taxbills it shall be the duty of the common council by ordinance to order the work to be done, etc. It. has another proviso to the effect that when any parkway or boulevard has been constructed, paved, guttered and otherwise improved at the expense of the adjoining property, such park or boulevard shall thereafter be maintained at the expense of the park district in which the same is situate or out of the general park fund.

This section also has the following provisions: "The contract for doing the work of construction and furnishing material for any such improvement shall be let by the said board of park commissioners *in such manner as shall be provided by ordinance;* and such work shall be done under the supervision and control of the board of park commissioners."

It contains the additional provision that in case property-owners to be disturbed or damaged by a grading or regrading shall not have waived all right to compensation, proceedings shall be instituted by the mayor and city council, as provided in other sections of the

city charter, to ascertain the damages and benefits arising from such grading.

Section 32 provides the city shall not be liable, by reason of the invalidity or error in special taxbills or assessments, to pay the same.

Section 33 provides that on the recommendation of the board the real estate (exclusive of improvements) in each park district may be annually assessed for maintaining, adorning, constructing, repairing and otherwise improving parks, parkways, roads, boulevards, avenues or portions thereof located therein which are under control and management of the board —such assessment to be made and collected by ordinance of the city council.

Section 34 requires the mayor and common council to include in the apportionment of the revenue of the city an appropriation for acquiring, establishing, maintaining, adorning and improving parks, parkways and boulevards, etc., under the management and control of the board. The sums used for such purposes are to be paid out of appropriations from the general funds of the city except as herein provided, and the board has power to pay out by warrant drawn on the city treasurer and expend such money as may be collected, appropriated, etc., but the money of one park district shall not be appropriated for use in any other.

Section 35 requires the board to make a report each year to the council and gives the council power to require a report at any time.

Section 36 prohibits the laying out or constructing through any park of any road or street except the park commissioners shall lay out or construct the same or permit it to be done, etc.

Section 37 gives the *common council power to agree to trusts and conditions* prescribed by the grantors or devisors granting, bequeathing, devising or conveying to the city real or personal property for the purpose of improvement or ornamentation of parks, park-

ways or boulevards, etc. It contains this provision:
"Real estate may also be devised or conveyed to the
city for the purpose of parks, parkways or boulevards,
or additions thereto, upon such conditions, including
exemption from payment of benefits or assessments
for such improvements, as may be prescribed by the
grantors or devisors thereof; provided, that the loca-
tion of such real estate be acceptable and the condi-
tions of the conveyance be agreed to by the common
council and board of park commissioners."

Section 38 gives the board power to make by-
laws, etc., to orderly transact and conduct its business,
and to make and enforce contracts in the name of the
city to carry out the purposes expressed in this arti-
cle, etc., and to appoint, employ and dismiss such en-
gineers, etc., as it may deem necessary, and to pre-
scribe their duties, etc.

Section 39 provides that when the board recom-
mends and the council passes an ordinance on such
recommendation, the ordinance need not recite the
recommending resolution at length, but it shall be suf-
ficient to recite the fact of the recommendation, etc.

Section 40 dovetails the present into the former
charter scheme, so as not to break or invalidate acts
of former boards in process of completion when arti-
cle 10 was adopted.

So much for the charter.

*The facts*: The record of the board shows the fol-
lowing: On October 12, 1904, it was resolved that the
location of a roadway through The Paseo from 27th
to 29th streets be laid over until the next meeting.
(We infer from the oral testimony that negotiations
relating to a change of this roadway from the lake
as originally designed over west so as to abut on plain-
tiffs' property were then under way.)

The next official step was on October 19, 1904. At
that time it was resolved by the board that the loca-
tion of the roadway through The Paseo from 27th

street to 29th street be taken up when a petition and agreement of the property-owners along the roadway is presented to this board.

The next was on February 15, 1905. It seems in the meantime plaintiffs made a written proposition to the board and this proposition now came up for consideration. That proposition was in substance that if the board would construct the roadway along the "westerly" property line instead of by the "lake drive as originally proposed," J. L. Porter and others would pay the difference in cash as estimated by the engineer of the board, the same being the difference between the cost of grading and constructing the roadway along the property line (of those making the proposition) from what it would be along the lake front. The proposition narrates that from the south line of Twenty-seventh street to the center line of Twenty-ninth street the board's engineer had estimated the difference in the cost of construction to be $1,343.82 and "the undersigned" agreed to pay that difference in proportion to the frontage of their property. From the center line of Twenty-ninth street to the north line of Thirtieth street said parties offered to pay one-half of the estimated cost of the construction of that portion of the driveway in front of their property, amounting to $1502.67.

In consideration of the foregoing payments and the construction of the driveway as proposed by the board "the undersigned" severally agreed to approve the grade proposed by the engineer of the board, waive all claims of damages therefor, and agreed to dedicate to the city such portions of the property of J. L. Porter, Ada Lee Porter and D. B. Holmes as may be necessary to make a uniform strip of twenty feet between the line of the driveway as proposed and the property line.

The offer continued as follows: "The payment of the aforesaid sum would be made in cash upon the

adoption by the board of park commissioners of the proposed driveway and the provision for its grading and construction as proposed. Upon its being constructed and paid for the dedications mentioned, necessary to rearrange the property line and leave twenty feet strips between the property line and the roadway, will be made.''

The foregoing written proposition was signed by the plaintiff, J. L. Porter, by A. Lee Porter through his guardian J. L. Porter, by James B. Porter through the same guardian, by Emily Hall Porter through the same guardian, by Mrs. James B. Porter, Jessie L. Porter, Emma Porter Hall, Jessie Hall Logan, W. J. Long and D. B. Holmes; and was accepted by the resolution of the board with a proviso as follows: ''Provided the property-owners along the roadway will agree to pay the expenses of building *a curb, gutter and sidewalk* along their property on the west-side of the driveway.'' Three members voted to adopt the resolution of acceptance and two contra.

On the 10th day of March, 1905, said parties seem to have delivered to the board the following communication:

''KANSAS CITY, Mo., March 10, 1905.
''*To the Board of Park Commissioners, City.*

''Gentlemen: Referring to your recent action in which you accepted the proposition of the undersigned in regard to the construction of the roadway on The Paseo Extension through what was formerly Troost Park, and referring to the condition of acceptance as contained in the motion, that our proposition was accepted with the provision that the sidewalk along the west side of the roadway should be constructed at the expense of the adjacent property, we herewith file our acceptance of the condition.''

It will be noticed that the proviso in the resolution of the board on February 15th relating to an agreement on the part of the property-owners to pay

the expenses of building "a curb, gutter and sidewalk" along their property on the west side of the drive, is referred to in the foregoing communication as "the provision that the *sidewalk* along the west side of the roadway should be constructed at the expense of the adjacent property." Whether the board through design or inadvertence overlooked the terms of the proviso relating to building a curb and gutter in its acceptance of February 15 remains unexplained in the record. At all events on April 12, 1905, by a vote of three in favor to two against, the communication of March 10, 1905, just set forth, is by resolution of the board appearing on its minutes referred to as "a proposition," and, with a proviso that the sidewalk aforesaid be constructed at the expense of the adjacent property, is accepted. It seems that the parties making the proposition had tendered to the board their checks for $2846.49, the total of cash to be paid, and on April 5th the president of the board gave them a receipt narrating, among other things, that it was "given pursuant to the proposition of said parties heretofore made and accepted by the board of park commissioners as shown by its record." Accordingly it was ordered by the board, as appears from its proceedings on April 12, 1905, that the checks representing said sum "be deposited in the city treasury to the credit of the south park district fund, to be used and paid out of said fund; to be used for the construction of said roadway above described as at present planned, in front of the property owned by said parties on the west side of The Paseo and between the streets named."

The next official minute was on July 31, 1905, followed by one on August 3, of the same year. That of July 31 is as follows:

"Member Gregory offered and moved the adoption of the following resolution:

"Be it resolved by the board of park commissioners of Kansas City, Missouri, that Resolution No. 4188, adopted February 15, 1905, and Resolution No. 4252, adopted April 12, 1905, accepting proposition of J. L. Porter et al. in relation to constructing the roadway along the westerly property line, instead of the lake driveway, as originally proposed, and accepting the sum of $2846.49, being the difference between the cost of grading and constructing the roadway along the property line from the south line of Twenty-seventh street to the center line of Twenty-ninth street, in The Paseo, be and the same is hereby repealed, and the secretary is instructed to write a letter to R. E. Ball, attorney for J. L. Porter et al., giving a copy of the opinion recently rendered by the city counselor with reference to the validity of Resolution No. 4188 and say that the Board does not deem it in accordance with the best interests of the city to carry through the plan proposed by such resolution and deems it its duty to return the money paid by you to the Board of Park Commissioners April 12, 1905, and he is further instructed to draw a check in the sum of $2846.49 against the South Park district in favor of R. E. Ball, attorney for J. L. Porter et al., also return the deeds delivered by them to this Board.

"The motion to adopt having been seconded by member Doggett the resolution was adopted.

"Ayes: Hudson, Dean, Doggett, Fuller and Gregory—5 ayes."

That of August 3 is as follows:

"On motion of member Fuller seconded by member Dean the following resolution was adopted:

"That a warrant be drawn in favor of R. E. Ball, attorney for J. L. Porter and others, for the sum of $2846.49 against the South Park district, so as to return the money deposited by him with the board of park commissioners April 12, 1905, and the president

of this board be authorized to sign, and the secretary is directed to countersign the same.

"Ayes: Hudson, Dean, Doggett, Fuller and Gregory—5 ayes."

In accordance with the last resolution a warrant for the amount of the plaintiffs' deposit was drawn. It seems that towards the latter part of May, 1905, the deeds referred to in the proposition were prepared, signed and acknowledged, using land descriptions furnished by the engineer of the board—seven in all. They conveyed odds and ends of property to Kansas City by highly technical descriptions. The land conveyed in each deed was small and we have no means of ascertaining the acreage. The object of these deeds was to put the title in Kansas City to such corners and parcels abutting on the old Troost Park as would make a uniform strip twenty feet wide in form of a curve on the west of the driveway proper, on which strip the sidewalk referred to in the resolutions was to be built. Each deed ran on the following common condition and reverter clause:

"To have and to hold the same unto said party of the second part, to be used and enjoyed for the purpose of a roadway or boulevard along the western line of a public parkway in said city, now known as 'The Paseo' extension; upon the express condition, however, that in the event of the abandonment by said city of such use and purpose, said property shall thereupon revert to the then owner or owners, their heirs and assigns of the land abutting the same on the west."

Just when these deeds came into possession of the secretary of the board is dark, but they did come into his possession in the summer of 1905.

On August 3, 1905, the secretary took the deeds and the warrant for the deposit and in person and

226 Sup—17

pursuant to the resolution of that date tendered them back, accompanied by the following letter:

"KANSAS CITY, Mo., August 3, 1905.
"*Mr. R. E. Ball, Attorney for J. L. Porter et al.,*
  "Kansas City, Missouri.

  "Dear Sir: In accordance with the opinion recently rendered by the city counselor of Kansas City, Missouri, a copy of which I herewith inclose, with reference to the validity of Resolution No. 4188, and it not being deemed in accordance with the best interests of the city to carry through the plan proposed by such resolution, the board deems it its duty to return to you the money paid by you into the city treasury, for which a check in the sum of $2846.49 is herewith inclosed, and also the following deeds:

  "Two deeds from J. L. Porter and Ada S. Porter.

  "Two deeds from Porter T. Hall.

  "One deed from Tillie D. Porter and Jesse L. Porter.

  "One deed from Daniel B. Holmes and Lyda M. Holmes.

  "One deed from Jessie Hall Logan and Allen Logan.

"Very truly yours,
"F. P. GOSSARD, Secretary."

Plaintiffs refused the tender. By their written letter, through their learned counsel, the tender was construed as an offer to rescind the arrangement heretofore made by his clients with the city. He doubted the soundness of the city counselor's opinion, asserted the full power of the board to do as it had done, denied the right of the board to rescind without the consent of his clients, asserted they had fully performed their part of the arrangement and that "unless it is competent for the city to change its mind and repudiate the agreement made, it also must comply."

Exhibit number 2 referred to in the judgment of the court was put in evidence. It is a diagram or map (sketched by the board's engineer) of the boulevard or roadway in The Paseo between Twenty-seventh and Twenty-ninth streets as contemplated in the new scheme of February 15, 1905, whereby the roadway is shown as running next to plaintiff's property on the west. It shows a roadway forty feet wide, with a uniform strip west of the roadway of twenty feet. It shows the proposed west contour line of The Paseo to be a curve twenty feet from the roadway proper (*Nota bene*: The original west line of The Paseo was angular, *i. e.*, zigzaz). It shows the little odds and ends that plaintiffs should deed to the city to make the park grounds curve and twenty feet in width west of the roadway proper. It has a supplemental profile drawing of the grade, showing fills, elevations and excavations of the proposed roadway as worked out by the engineer of the board.

There was oral testimony. The substance of material parts of it is as follows: Mr. Kessler, engineer of the board, testified that he recommended (verbally, we assume) to the board in 1905 that a driveway against the abutting land would be best; that he estimated the difference in cost as last proposed as against the roadway as first proposed at $1343.82, and that half of the total cost from Twenty-ninth to the north line of Thirtieth street was $1502.17; that his estimate covered "grading, paving and gutters," but did not include the sidewalk.

We find no testimony establishing the width or material out of which the sidewalk was to be built. It seems the engineer made several estimates of the cost of the roadway based on different materials, and that the one referred to hereinbefore was based on the "final conclusion of finishing the roadway in limestone macadam in the same way that the driveways are built." As we gather it, the proposed construction

was "park drive construction," whatever that may be; that there was a standard boulevard construction under specifications filed with the board, but they were more costly than the estimate furnished for the construction of this roadway, and we do not know what "boulevard construction" is. That is as near as the testimony discloses the engineer's specifications of material, depth, etc., for building the roadway, except that it appears that the total estimate for the roadway between Twenty-seventh and Twenty-ninth streets was $14,723.50 in 1905. Mr. Kessler also testified that the working theory adopted and in use by the board was this: Where a park drive or roadway did not abut on private property, the board bore the whole expense of construction, but where it abutted on private property the abutting proprietor shared the expense through special taxbills.

The secretary of the board testified that no ordinance had been passed by the city council relating to the improvement, nor had the deeds of plaintiffs been submitted to the council, nor had the council taken any action by way of adopting or approving the conditions in those deeds or in accepting the grants. On February 15, 1905, the board had a balance on hand in the South Park district fund of $2851.13, not including plaintiffs' deposit. What it had on hand on April 12, 1905, is dark. What money was subject to its order at the time suit was brought is also dark. There was no evidence that the board had used the deposit of plaintiffs. It seems to have been kept intact and is tendered back in defendants' return by way of answer to the alternative writ. It appears also that on February 15, 1905, there was in the "Park and Boulevard Improvement Fund" arising from the sale of $500,000 bonds, an unappropriated balance of $19,-759.57. And further that the plan in vogue at that time, based on charter provisions, was that the city council from time to time appropriated the fund aris-

ing from the sale of said bonds for the payment of the obligations of the board, and that such appropriation had to be made before using bond proceeds in payment of debts contracted by the board. The record shows there was a ''park maintenance tax,'' but it is not shown what amount was on hand from that source.

The case proceeds on the theory that plaintiffs made demand on the board to build the roadway next to their property and defendants refused. Furthermore, it proceeds on the theory that the cost of the roadway is a fixed sum ascertained in 1905, to-wit, the estimates of the engineer as hereinbefore set forth. Those estimates were as follows: For that section between Twenty-seventh and Twenty-ninth streets, $14,723.50—for that section on south from Twenty-ninth to Thirtieth street, the half was $1502.17, making the whole cost of the last section $3004.34. This latter sum added to the estimate for the two blocks between Twenty-seventh and Twenty-ninth makes the total estimate for the proposed improvement $17,-727.84 to Thirtieth street. Deducting from that amount the cash deposit of plaintiffs, to-wit, $2846.49, leaves $14,881.35 to be paid out of the common purse, or park fund, on the estimated cost five years ago. Whether the roadway can be built for anything like the outlay at this time is not shown. The cost of the roadway from Thirtieth to Thirty-first streets is entirely dark.

The pleadings need not be set forth *totidem verbis*. They will be referred to later, and may be summed up in this way: They were so drawn that if the foregoing record facts entitle plaintiffs to relief to the extent set forth in the writs of mandamus issued, then the judgment was well enough; otherwise, not.

We have come to the conclusion that the judgment cannot stand. This, because:

I. The petition counts on the theory that plaintiffs own property west of The Paseo from Twenty-

seventh street down south to Thirty-first; that the ar-
rangement entered into between them and the board
had in view a roadway from Twenty-seventh to Thirty-
first street abutting said property; and that such ar-
rangement was binding on the board. The alternative
writ followed the lines of the petition in that behalf,
citing defendants to show cause. The permanent writ
followed the same lines. · By its judgment the trial
court specifically found the recitations of the alter-
native writ true, and commanded defendants to locate
and construct the roadway from Twenty-seventh to
Thirty-first street—all to be done "in accordance with
the plans and location" adopted by the board of park
commissioners "on February 15, 1905," "as shown by
the plan and profile herein filed and referred to in ex-
hibit 2." If, now, we turn to exhibit 2 and the plan
and profile there marked down and take account of the
accepting resolution of the board of February 15,
1905, and even if, not stopping there as the court in
its judgment does, but going on and taking account
of the subsequent orders of the board in April, 1905,
consummating the arrangement as modified (which is
the most favorable view possible to plaintiffs), a sin-
gular condition of things is at once sprung. Exhibit
2 is labeled: "Plan and Profile of The Paseo from
Twenty-seventh to Thirtieth street through Troost
Park." There is no word, line or figure in it relating
to the region from Thirtieth to Thirty-first street. The
first study sketch or map of the engineer, anent the
roadway hard by the lake, related to the same section
of The Paseo as exhibit 2, and has not a figure, line
or word relating to the region between Thirtieth and
Thirty-first. So the original written proposition of
plaintiffs, accepted by the board on February 15, 1905,
in terms relates to a roadway through that part of The
Paseo between Twenty-seventh and Thirtieth streets
only. Again, the modified proposition and the resolu-
tion of the board relating thereto on April 12, 1905,

*ex vi termini,* concern a roadway through The Paseo
from Twenty-seventh to Thirtieth streets only.  The
receipt given by the president of the board on April
5, 1905, for the cash deposit refers to "the construc-
tion of the roadway as at present planned in The Paseo
extension between Twenty-seventh and Thirtieth
streets in Kansas City, Missouri."  The estimates of
the engineer concern only that part of the roadway.
Whether the enumerated tangents, radii, curves, metes
and bounds of the descriptions in the deeds include
land between Thirtieth and Thirty-first streets we
know not.  The upshot of it all is that plaintiffs had
an arrangement with the board relating to a roadway
from Twenty-seventh to Thirtieth street.  It stopped
with that.  It is not argued that plaintiffs are entitled
to relief in this form of action unless their contract is
valid and binding.  Therefore, they stand or fall on
the very terms of it.  When, then, you have encom-
passed and grasped the contract you may safely ex-
claim: *Rem acu tetigisti.*  But the court went out-
side of it and granted the full relief prayed in the
petition and demanded by the alternative writ, ignor-
ing the vital fact that the proof did not sustain the
scheme outlined in the alternative writ and petition.
It permitted an absolute writ of mandamus to go for
a roadway a block longer than contemplated in the
proposition of plaintiffs or the resolutions of the board
and this without any action of the park department
locating or agreeing to locate or build the roadway
from Thirtieth to Thirty-first street, or any estimate
of the cost of that portion of the roadway, or any
map, diagram or specification existing.  Assuming for
the present only, that the board might contract away
its official discretion by making arrangements with
private parties in locating roadways to be built by or
in parks, yet there was no contract at all to sustain
the writ as issued, and before the judgment in this
case in its entirety could be sustained we would have

to hold that at the suit of private parties the discretion of the board could be "cribbed, cabined, confined" or coerced by a court in the first instance. I know of no law or rule of public policy to be subserved by substituting the discretion, of a court of justice in the place and stead of the discretion given by the charter scheme of Kansas City to the park board itself, unless there be first some valid contractual obligation coinciding with a clear public duty. Being broader than, and hence not supported by, the proofs, and being outside any contract whatever, the judgment as it runs in its present form must be held bad.

Once upon a time it was common learning that the recitations of the alternative writ of mandamus must agree with those of the petition, and those of the peremptory writ with those of the alternative, and that the judgment should follow the lines of each— the one fixing the other. Under that doctrine, as strictly applied, if plaintiffs were not entitled to all they asked in the alternative writ, they get nothing at all. Says HENRY, J., in School District v. Lauderbaugh, 80 Mo. l. c. 194-5: "A mandamus proceeding cannot be used as a drag-net. The party seeking relief by that proceeding must specify just what he wants, nothing more or less. . . . 'The defendant is not required to look *dehors* the alternative writ to ascertain his duty. . . . The greatest care is to be bestowed upon the proper framing of the mandatory clause, the rule being that the writ must be enforced in the terms in which it is issued or not at all.'" But the modern practice is more liberal and (to further justice) amendments are now allowed to these writs. [School District v. Lauderbaugh, 80 Mo. l. c. 195; State ex rel. v. Francis, 95 Mo. l. c. 58; State ex rel. v. Baggott, 96 Mo. l. c. 71.]

So that, if there was nothing more to the case we would reverse and remand to allow plaintiffs to amend their petition and writ in accordance with the proofs,

if they elected to do so, and take a judgment thereon limiting the command to the roadway between Twenty-seventh and Thirtieth streets, a final writ in accord to follow. But there is something else.

II. The board of park commissioners of Kansas City is a ministerial body as contradistinguished from a legislative or judicial one. Such is the charter scheme, as readily seen from the outline given. The commissioners constitute an "executive" board. It is elementary that mandamus is a discretionary writ—issuing only in the exercise of a sound (*i. e., judicial*) discretion. It will issue to coerce action but not to regulate or control a discretion reposed by law in an official while acting. The thing the writ is aimed at is the performance of a ministerial duty "*imposed by law.*" [Goodloe v. Lanier, 47 La. Ann. l. c. 569.]

In State of Miss. v. Andrew Johnson, President of the United States, 4 Wall. l. c. 498, a ministerial duty enforceable by a court through a writ of mandamus was thus defined: "A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted, or proved to exist, *and imposed by law.*"

Therefore, it will not issue in cases of doubtful right. [State ex rel. v. Buhler, 90 Mo. 560; State ex rel. v. Gibson, 187 Mo. 553.]

A litigant asking relief by mandamus must allege and prove that he has a clear, unequivocal, specific right to a thing claimed. He must show himself possessed of a clear and legal right to the remedy. [State ex rel. Doud v. Lesueur, 136 Mo. 452; State ex rel. v. Williams, 99 Mo. 291; State ex rel. v. Boonville Bridge Co., 206 Mo. 74; State ex rel. v. McIntosh, 205 Mo. l. c. 610.]

Mandamus is essentially an inflexible and unreasoning writ. Its terms are cast iron, hard and fast. It says to one go, and he goeth—come, and he cometh. Therefore, it does not go where there is any other adequate remedy, and it never issues to enforce a right resting merely on a contractual obligation, or to compel the performance of an executory contract, or to compel the performance of unauthorized or illegal acts or where the ultimate object to be attained is unlawful or against public policy. If authority be needed for such fundamental propositions, they may be found in briefs of defendants' counsel.

Keeping in mind the foregoing proposition, as postulates to reason from, we observe:

The alleged contract at best was executory. The petition and writ in no just sense seeks to enforce a ministerial duty, which duty at the same time coincides with and becomes a clear public duty arising from an executed contract. Here defendants did nothing more than to make the so-called contract. They had lifted no finger and taken no step by way of performance; neither had the city council done aught by way of approval or authorization through ordinance or resolution. True, plaintiffs had put their cash deposit into the custody of the board, and to that extent there was part performance on their part, but, on their own theory, the sidewalk was yet to be built by them. Moreover, if the strict language of the resolution of February 15, 1905, is to be complied with, defendants under the proviso were also to build the gutter and curb. If that proviso was in the nature of a new proposition, and if the proposition of April 12, 1905, is to be considered as a refusal of the proviso in part, and in turn as a new proposition, eliminating the gutter and curb, and if the resolution of April 12th was the acceptance of such new proposition, then there was to be no further performance by building a gutter and curb. But the judgment of the court took no notice of the pro-

ceedings of April 12, 1905. It makes a call for the proceedings, the location and plans of February 15th alone. If the proposition and acceptance of February 15th are to be alone read into the judgment under the call there made, then defendants were called upon for performance in building a gutter and curb as well as a sidewalk. Whatever view be taken of that feature of the case, the most that can be said of this contract is that it was entirely executory on one side and executory in vital features on the other. This remains true even if we consider the deeds; since the mere making of the deeds and handing them over to the secretary of the board were not in compliance with the contract itself and therefore not part performance. Those deeds were not due to be executed by delivery until the roadway was "constructed and paid for." They came into the case born before their appointed time. Again, there is no acceptance of them shown by the official minutes of the board. However, they were put subject to the board's control at some uncertain date in the early summer of 1905, and the only mention made of them by that body is in the order to return them in the resolution of July 31st of that year.

While we are about it, we may as well say that the deeds were an essential element in the contract. The operative effect of these conveyances, when completed by acceptance, would be to enlarge the boundaries of The Paseo. The charter and scheme may be searched in vain for any exclusive power in the board, or any discretion it in or of itself alone may effectually exercise, in enlarging the area of the park, parkway or boulevard. To the contrary, the city council had an equal and ultimate voice in such matter. We can put no other meaning on section 5 and section 8 of article 10 of the charter, supra (q. v.). Not only so but these grants were on a condition subsequent, and it is plain that by section 37 of article 10 the board was without

power on its own initiative to accept such grants coupled with any such condition. It was for the city council to agree to "the conditions prescribed by grantors . . . granting . . . or conveying to the city real *or personal property* for the purpose of improvement . . . of parks, parkways or boulevards." The council, at least, had an equal voice under that scheme so far as real estate was concerned; for the section runs with a proviso, *viz.*: "Provided, that the location of such real estate be acceptable and the conditions of the conveyance be agreed to by the common council and board of park commissioners."

But this is not all. We think that section 37 contemplates that the city council should agree to any condition upon which money is turned over to the board by private parties, if there be a condition attached to its payment. Certainly, money is "personal property," and section 37 by broad and fair construction contemplates that the city council should have a guiding (if not masterful) finger in those contracts whereby private parties turn over personal property to the board for the purpose of improving parks, parkways or boulevards "on condition." The duties of this board are sharply defined by the charter. The channel of its discretion is well marked out in the usual run of things. However, unusual things sometimes happen and are well worth while providing for. Accordingly the charter scheme contemplated that an emergency might arise not covered by ordinary charter plans for locating and building parks, parkways and boulevards and acquiring property therefor (and raising money for their construction) through condemnation proceedings, assessments or special benefits or bond issues. Therefore, it held in mind the fact that public spirited or interested citizens might wish to voluntarily aid in the improvement of parks or parkways and boulevards by grants of land and personal property. Now, such grants are more often than not subject to a *condition,*

and when such condition is impressed upon the grants
the charter reserved to the city council the power to
accept the condition, and this was a very wise provis-
ion to keep the board from having a free hand in mak-
ing entangling alliances and contractual obligations
running with gifts and grants.  It is plain there was a
condition attached to the payment of this money.  That
condition, in some of its phases, was to the effect that
the park board should proceed to expend out of the
public purse, say seven dollars for each dollar put
into the scheme by plaintiffs; that the board should
waive its right to proceed to locate and build the road-
way abutting plaintiff's property under the charter
plan of making plaintiffs pay a pro rata share thereof
by special assessments; and that the board should
surrender its discretion to locate the roadway on any
other line through Troost Park.  In the view we take
of it, all these conditions arising from the payment
of this money under this contract came within the pur-
view of section 37, they lie well within the mischief
struck at and therefore never became effective until
accepted by the city council.

There is another view to take of this contract.
Section 31 of article 10, supra, contemplates that the
work of constructing and furnishing material in the
paving, guttering or otherwise improving a roadway,
earmarked as a boulevard or avenue, "should be let
by the said board of park commissioners *in such man-
ner as shall be provided by ordinance.*"  Plaintiffs
show no ordinance and yet by its moving writ the court
commanded the board to proceed in a heavy outlay
of public funds without an ordinance of the common
council.  What public good can be subserved by graft-
ing such mischievous innovation    on    the    charter
scheme?  Was it the intention of the charter-makers
that the board by assuming some contractual relation
with abutting owners could thereby cut loose from the
checks prescribed by the charter and eliminate all

control of the council or put themselves in such fix that a court would compel them to go on regardless of the wishes of the council? We think not. That would be a very convenient loophole of escape from charter provisions. It would open a door that might better be kept closed.

But we have pursued the matter far on this feature of the case. We conclude:

(a) That the contract was substantially executory and mandamus would not lie for its enforcement.

(b) That it was incomplete in that it was never vitalized by the city council. In that sense it was an illegal contract and against public policy as evidenced by the charter. Therefore, it could not be enforced by mandamus.

(c) That the performance of a ministerial duty under the arrangement here was not "imposed by law," therefore mandamus could not lie.

(d) That the right is doubtful—i. e., plaintiffs did not show themselves possessed of a clear and unequivocal right to the specific thing claimed, and therefore mandamus would not lie.

The premises considered, defendants' right to rescind the action of the former board, to pay back the money and return the unaccepted deeds, is undoubted.

III. It is argued for plaintiffs that the public are entitled to a thoroughfare in The Paseo from Twenty-seventh street to Thirty-first street and the defendants have neglected their duty to build one. That may be so or not so. It would depend on the public need, and the state of the board's finances, the condition of the market for material and labor, etc. A sufficient answer to that contention is that there is no such case here. This is not a suit to compel defendants to locate and build a public thoroughfare in The Paseo. It is a suit to compel defendants to build the specific thoroughfare on a definite line in The

Paseo, on a definite estimate of cost made five years
ago—all this by virtue of a contract. We have been
unable to perceive how the public duty to build a
thoroughfare coincided with any duty to build the
specific thoroughfare contracted for and enforced by
mandamus.

Counsel rely on such cases as the Borough of
Rutherford v. Hudson River Traction Co., 63 Atl. 84;
Ingerman v. State, 128 Ind. 225; State ex rel. v.
Railroad, 37 La. Ann. 589; State v. Bell, 49 La. Ann.
676; Richmond v. Brown, 97 Va. 26; State ex rel. v.
St. Louis, 145 Mo. 551; Dausch v. Crane, 109 Mo. 323;
Weston v. Newburgh, 67 Hun 127; Sheridan v. Flem-
ing, 93 Mo. 321. It is not necessary to prolong this
opinion by an analysis of those cases. Some of them
proceed on the theory that where there is a clear pub-
lic duty to be performed by a board acting in a min-
isterial capacity, the presence of a contract does not
destroy the right of a mandamus. where there is no
other adequate remedy for one of the contracting
parties. The facts in none of those cases called for
an application of the principles of law decisive of the
case at bar.

The judgment is reversed and the cause is re-
manded with directions to the lower court to enter a
judgment to quash the alternative writ of mandamus,
denying an absolute writ and dismissing plaintiffs'
petition.

*Burgess, Gantt, Fox* and *Woodson, JJ.,* concur;
*Valliant, C. J.,* and *Graves, J.,* dissent. *Valliant, C. J.,*
in an opinion filed.


## DISSENTING OPINION.

VALLIANT, C. J.—I am unable to concur in the
conclusions reached by my learned Brother LAMM in
this case. Mandamus of course cannot be used to
control an officer in the exercise of his discretion,

but when the officer has exercised his discretion and in the exercise thereof has made a decision which he had authority to make, and on that decision has made a contract he also had authority to make, his discretion has ended; the performance or repudiation of his contract is not then in his discretion. The park commissioners had authority to locate this roadway either with or without agreement with the interested property-owners; they saw fit to enter into negotiations with the property-owners, and having done so, they did locate it and accepted the consideration that relators agreed to pay; that ended their discretion. If they had seen fit to do so they had authority in law to construct the roadway where they had agreed to construct it. It would have been no breach of their official duty to have done so. What they now claim is discretion to violate their contract.

As to the point that the petition for mandamus asks for more than the relators, under the contract, were entitled to, that is, to carry the boulevard as far as Thirty-first street, if that is so, the court by proper proceedings could have had the record amended so as to limit the remedy to what the contract calls for.

This is, as claimed, in a sense, an executory contract, but relators on their part have performed it, and if the park commissioners are allowed to do what they are claiming the right to do they may if they choose go on and build the roadway on another line, shut out the property of relators, and relators will have no remedy for the wrong; mandamus is the only remedy they can have. Even a judgment in damages for a breach of the contract would not give them what they paid their money for. In my opinion, the judgment ought to be affirmed. Judge *Graves* agrees with me in this opinion.