STATE of Missouri, ex rel. CAPITOL QUEEN AND CASINO, INC., Becker Gaming, Inc., Bruce F. Becker, Barry Becker, Ernest Becker, III, and Ernest Becker, IV, Respondents,

v.

MISSOURI GAMING COMMISSION, and Robert L. Wolfson, Sr., Robert M. Clayton, II, Jenice P. Stewart, William J. Quinn, and Avis Tucker, Commissioners of the Missouri Gaming Commission, Appellants.

No. WD 51430.

Missouri Court of Appeals,
Western District.

April 30, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 2, 1996.

Application to Transfer Denied
Aug. 20, 1996.

---

Jeremiah W. (Jay) Nixon, Atty. Gen., Kurt P. Valentine, Asst. Atty. Gen., Jefferson City, for appellants.

William England, III, Jefferson City, for respondents.

Before SPINDEN, P.J., and LAURA DENVIR STITH and EDWIN H. SMITH, JJ.

SPINDEN, Presiding Judge.

The Missouri Gaming Commission asks us to resolve to what extent it must investigate an application for a riverboat casino before denying it. The commission denied an application submitted by Capitol Queen and Casino, Inc., (CQC) after deciding that CQC had not been forthright about its dealings with a Kansas City lawyer and others. CQC contends that the commission was obligated to investigate it "thoroughly" before voting on its application, and the commission failed to do so. CQC convinced the circuit court to issue a writ of *mandamus* ordering the commission to examine the application more thoroughly. The circuit court issued the writ, and the commission appeals. We remand to the circuit court so it can quash its writ.

On September 20, 1993, CQC filed its application for a license to operate a riverboat casino in Jefferson City and paid a $60,000 filing fee. On August 2, 1994, the commission's staff asked CQC why it had not disclosed in the application its agreement to give Kansas City lawyer Byron Fox and others nearly $6 million. Bruce Becker, CQC's chief executive officer, answered for the corporation in a letter on August 18, 1994, and the next day commission staffers met with CQC representatives to discuss the matter.

On August 22, 1994, Thomas J. Irwin, the commission's executive director, wrote Becker:

> Pursuant to Section 313.810.5 R.S.Mo.,[1] please be advised that the investigative staff of the Missouri Gaming Commission will recommend that the application of Capitol Queen & Casino, Inc. ("CQC") for a riverboat gaming license be denied and that neither CQC nor any entities directly or indirectly controlled by CQC or any of its principals or substantial owners shall ever again be considered for application by the Commission.
>
> This recommendation will be made based on the fact that CQC knowingly made false statements on its riverboat gaming application that were both substantive and material to the application and the proposed riverboat gaming operation.

The commission met on September 28, 1994, and heard the staff's recommendation. The false statements referred to in Irwin's letter involved CQC's failure to disclose an agreement of September 20, 1993, that Becker Gaming, Inc., had with Byron Neal Fox, Cathryn Simmons, Public Issue Management, Inc., Cynthia L. Penner, Richard Moore, David Chesnoff, Oscar B. Goodman, Eckley M. Keach, Ronald E. Partee, and Carol Partee.[2]

---

1. This statute says, "A person who knowingly makes a false statement on an application is guilty of a class A misdemeanor and shall not ever again be considered for application by the commission."

2. Becker told the commission that his original deal with Fox was to give Fox 20 percent of the casino interest in payment for his obtaining a license. With whom Fox shared his 20 percent, Becker said, was entirely up to Fox. "[H]e used people to work for him," Becker said. "How he divied [sic] it up—these are all Byron's calculations."

The agreement identified CQC as "a wholly owned subsidiary of Becker Gaming." It stated that the Fox group had received a 19.75 percent "equity interest" in the Jefferson City riverboat casino in consideration for their assistance in obtaining local approval for the casino and that Becker had agreed to buy the equity interest for $5.9 million.

Mark Lerner, Becker Gaming's corporate lawyer, Bruce Becker and others assured the commission that CQC's not mentioning this agreement in its application was an oversight and, nonetheless, the agreement did not fall within any of the categories of information requested by the application. Lerner emphasized that CQC's officers signed the application on September 17, three days before everyone had signed the September 20 agreement.

The commission voted to deny CQC's application. It ruled that CQC could not apply again for two years.

On October 31, 1994, CQC asked the circuit court to issue a writ of *mandamus* voiding the commission's denial for violation of § 610.027, RSMo 1994 (the open meetings law), and ordering the commission to conduct "a full, thorough and intensive investigation of . . . CQC and its principals in connection with the application of . . . CQC[.]" The circuit court issued a preliminary writ finding that the commission's "reaching a decision by voting on . . . Capitol Queen & Casino, Inc.'s application for licensure without first conducting a full investigation and subsequent to a closed, private meeting in contravention of Missouri's Open Meetings Act, are in violation of Missouri statutes and therefore void." It commanded the commission's staff "to commence a full, thorough and intensive investigation into all aspects of the subject application for licensure of Capitol Queen & Casino, Inc." It ordered the commission, after the investigation, "to immediately take up, consider and render a decision with respect to said application in accordance with the Missouri Open Meetings Act[.]"

After listening to attorneys argue the merits of the case on June 23, 1995, the circuit court issued a peremptory writ three days later in which it ordered the commission to set aside its denial of a license to CQC because the commission did not conduct "a thorough investigation sufficient to permit a decision on the ultimate licensing issue" and because it did not make sufficient findings for a denial. The circuit court ordered the commission "to exercise [its] jurisdiction and authority by conducting a thorough investigation of the application for licensing of Capitol Queen & Casino, Inc. as required by law such as will permit the Commission to make a finding as to the applicant's suitability and fitness for licensing[.]"

■ The commission appeals. It argues that the circuit court's writ was tantamount to judicial review and was, therefore, inappropriate. We agree that the circuit court did not have a sufficient basis for issuing its writ, and we remand for it to quash its writ.

Assuming, without judging the issue, that the circuit court's conclusion was correct that the commission did not thoroughly investigate CQC's application before denying it, CQC had other adequate, less drastic, remedies available to it. Section 313.840.2, RSMo 1994, says, "Judicial review of all commission decisions relating to excursion gambling boat operations shall be directly to the state court of appeals for the western district of Missouri[.]" Had CQC sought judicial review, rather than asking for a writ of *mandamus,* it could have obtained review of whether the commission had a proper basis for denying its application.

■ "It is a long-established principle of law that mandamus does not issue where there is another adequate remedy available to relator." *State ex rel. Kelley v. Mitchell,* 595 S.W.2d 261, 265 (Mo. banc 1980)(citing a long list of cases, including licensing cases, holding that *mandamus* is inappropriate because other remedies are available). Long ago, the Supreme Court explained the basis for the rule: "Mandamus is essentially an inflexible and unreasoning writ. Its terms are cast iron, hard and fast. It says to one go, and he goeth—come, and he cometh. Therefore, it does not go where there is any other adequate remedy[.]" *State ex rel. Porter v. Hudson,* 226 Mo. 239, 126 S.W. 733, 740 (Mo. banc 1910).

58

CQC responds that all it wanted was to be investigated. "CQC has never maintained it has a right in the license itself and none of CQC's pleadings before the Cole County Circuit Court requested licensure," CQC argues. "Instead, CQC contends that it is entitled to an investigation and that until a deliberate, intensive and thorough investigation is performed, the Commission may not prematurely deny an application for licensure."

Assuming the commission's investigation was not thorough, we certainly disagree with CQC's contention that it had an independent right to "a deliberate, intensive and thorough investigation" before the commission denied its application. The General Assembly mandated "a thorough investigation" in only one instance: the *granting* of a license. Section 313.810.4, RSMo 1994, says, "Before a license is granted, the commission shall conduct a thorough investigation of the applicant for a license to operate a gambling game operation on an excursion gambling boat." In setting out the commission's powers in § 313.805, RSMo 1994, the General Assembly did not add the modifier "thoroughly" in authorizing the commission "[t]o investigate applicants" or "[t]o investigate alleged violations." A thorough investigation is a prerequisite only for granting a license, not denying it.

This does not mean that unsuccessful applicants are not without remedies for any arbitrary action by the commission. They have judicial review pursuant to § 313.840.2 in which they can complain of unlawful denial of their applications. There, in an appeal, they can obtain independent review of whether the commission unlawfully judged them as undeserving of a license.

CQC contends, however, that the commission promised to investigate its application thoroughly before voting on it. The commission made this promise, it asserts, in the application which said:

In consideration of the assurance by the Commission that no vote on said application will be taken except after a deliberate, intensive and thorough investigation of the undersigned, ... successors and assigns,

hereby release, remise, and forever discharge the State of Missouri, the Commission, its members, agents, and employees, from any and all manner of actions, causes of action, suits, debts, judgements [sic], executions, claims and demands whatsoever[.] [3]

We judge CQC to be asserting some type of contract breach: that the commission agreed to conduct a thorough investigation in exchange for CQC's release. *Mandamus* is not an appropriate remedy to enforce CQC's contract claim. "Mandamus has limited application. Mandamus is not an available remedy for an alleged breach of contract." *State of Missouri, ex rel. Bates v. American Polled Hereford Association,* 863 S.W.2d 350, 353 (Mo.App.1993).

We, therefore, remand to the circuit court so it can quash its writ.

All concur.

3. The parties do not contest the commission's authority for entering into such agreements, so we do not address the issue.